# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

| Present: The Honorable | James V. Selna | |
|---|---|---|
| Adrianna Gonzalez | | Not Present |
| Deputy Clerk | | Court Reporter |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: |
| Not Present | | Not Present |

**Proceedings:** **[IN CHAMBERS] Order re Cross Motions for Summary Judgment regarding Infringement and Invalidity of '862 and '935 Patents**

The Court is presented with cross-motions for summary judgment with respect to infringement and invalidity of the patents in issue.

Plaintiffs HID Global, *et al.* ("HID Global") move for summary judgment finding Defendants Farpointe Data, *et al.* ("Farpointe") liable for infringing various claims of U.S. Patent No. 5,952,935 (the "'935 Patent") and U.S. Patent No. 7,439,862 (the "'862 Patent"). (Pls.' MSJ re Infringement, Docket No. 150.) Farpointe opposes the Motion. (Defs.' Opp. to Pls.' MSJ re Infringement, Docket No. 224.) Farpointe also moves for summary judgment or, in the alternative, partial summary judgment finding Farpointe did not infringe the '935 Patent. (Defs.' MSJ re Noninfringement, Docket No. 165.) HID Global opposes the Motion. (Pls.' Opp. to Defs.' MSJ re Noninfringement, Docket No. 260.)

HID Global also moves for summary judgment or, in the alternative, partial summary judgment finding the '935 and '862 Patents to be valid. (Pls.' MSJ re Validity, Docket No. 153.) Farpointe opposes the Motion. (Defs.' Opp. to Pls.' MSJ re Validity, Docket No. 227.) Farpointe also moves for summary judgment finding the '862 Patent to be invalid. (Defs.' MSJ re Invalidity, Docket No. 160.) HID Global opposes the Motion. (Pls.' Opp. to Defs.' MSJ re Invalidity, Docket No. 262.) The Court has reviewed all evidentiary objections and relies only on admissible evidence in deciding the Motions.

For the following reasons, the Court GRANTS IN PART HID Global's Motion

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

regarding Farpointe's infringement of the '862 and '935 Patents and HID Global's Motion regarding the validity of the '862 and '935 Patents. The Court denies Farpointe's motions.

II.    <u>Legal</u> <u>Standard</u>

Summary judgment will be granted if there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). In the context of patent infringement, summary judgment is appropriate where "upon construction of the claims and with all reasonable factual inferences drawn in favor of the non-movant, it is apparent that only one conclusion as to infringement could be reached by a reasonable jury." <u>ATD Corp. v. Lydall, Inc.</u>, 159 F.3d 534, 540 (Fed. Cir. 1998).

The burden initially is on the moving party to demonstrate an absence of a genuine issue of material fact. <u>MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.</u>, 420 F.3d 1369, 1373 (Fed. Cir. 2005). If, and only if, the moving party meets its burden, then the non-moving party must produce enough evidence to rebut the moving party's claim and create a genuine issue of material fact. <u>Id.</u> If the non-moving party meets this burden, then the motion will be denied. <u>Bose Corp. v. JBL, Inc.</u>, 274 F.3d 1354, 1360 (Fed. Cir. 2001). The Court will view the evidence in the light most favorable to the non-moving party. <u>MEMC Elec. Materials, Inc.</u>, 420 F.3d at 1373.

Where the parties have made cross-motions for summary judgment, the Court must consider each motion on its own merits. <u>Fair Hous. Council v. Riverside Two</u>, 249 F.3d 1132, 1136 (9th Cir. 2001). The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under. <u>See id.</u> at 1137.

"In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56-3.

I.    <u>Discussion</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

_____The two patents at issue are the '935 Patent, which generally discloses a programmable RFID reader that is capable of reading transponders that use different frequencies and different methods of modulation, and the '862 Patent, which generally discloses an RFID reader that includes high and low frequency reader antennas configured to minimize interference between the antennas. (Claim Constr. pp. 3, 14-15, Docket No. 59.) The Court first addresses the infringement arguments regarding each patent, then turns to the invalidity arguments.

### A.   Infringement Analysis

Determining patent infringement requires a two-part analysis. CCS Fitness v. Brunswick Corp., 288 F.3d 1359, 1365 (Fed. Cir. 2002). First, the Court must construe the disputed claims. Id. Then, the Court must compare the "properly construed claims to the accused device, to see whether that device contains all the limitations, either literally or by equivalents, in the claimed invention." Id. To prove infringement, the patentee must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents. Playtex Prods., Inc. v. Proctor & Gamble Co., 400 F.3d 901, 906 (Fed. Cir. 2005). To prove literal infringement, the "patentee must show that the accused device contains every limitation in the asserted claims." Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206, 1211 (Fed. Cir. 1998). "If even one limitation is missing or not met as claimed, there is no literal infringement." Id. Infringement under the doctrine of equivalents, however, is found where "only 'insubstantial differences' distinguish the missing claim element from the corresponding aspects of the accused device." Leggett & Platt, Inc. v. Hickory Springs Mfg. Co., 285 F.3d 1353, 1359 (Fed. Cir. 2002).

In construing claim language, courts should begin with the principle that "the words of a claim are generally given their ordinary and customary meaning." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). Further, this ordinary and customary meaning "is the meaning that the [claim] term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Id. at 1313. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id. With these principles in mind, the Court now turns to the specific infringement issues presented in this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

1.    **Reliability of Expert Testimony**

As a threshold issue, the Court must determine whether the opinions of HID Global's expert witness Dr. Richard Mihran are reliable.  Farpointe argues that HID Global has no factual basis for its infringement analysis because Dr. Mihran did not inspect each individual accused product, and therefore he cannot credibly conclude they infringe the patents at issue.  (Defs.' Opp. to Pls.' MSJ re Infringement, pp. 3-5.)  An expert witness, however, need not physically inspect an accused product to offer a credible opinion regarding infringement.  See, e.g., Data Line Corp. v. Micro Techs., Inc., 813 F.2d 1196, 1200-12001 (Fed. Cir. 1987) (finding that a jury could rely on the expert testimony of experts who had not physically inspected the accused product).  Moreover, in setting forth his opinions, Dr. Mihran stated that he reviewed depositions of Farpointe employees, samples of Farpointe readers and various credentials, and a variety of technical documents provided by Farpointe as part of discovery.  (Mihran Report ¶ 14, Docket No. 202.)  Throughout Dr. Mihran's report, he refers to Farpointe product schematics, x-rays of the accused devices, and software code of the accused devices.  (Id. ¶¶ 72-345.)  Thus, the Court is satisfied that Dr. Mihran's expert opinions are competent and adequately based on reliable evidence.

2.    **'935 Patent**

HID Global alleges that certain of Farpointe's Pyramid[1] and Delta[2] series products infringe Claims 17, 18, and 19 of the '935 Patent.  (Pls.' MSJ re Infringement, Ex. A, Docket No. 150.)  The Court analyzes the properties of the accused devices by product series because the hardware and software relevant to the patent claims at issue are substantively the same among the individual products within a product series.  (Mihran Decl. ¶ 60; e.g., Deposition of Scott Lindley ("Lindley Dep."), Oines Decl., C, p. 620, Docket No. 194.)  To the extent a particular accused product deviates from the general properties of the reader series, the Court addresses those products separately.  The Court

---

[1]  The specific models are the Pyramid P-300, P-400, P-403, P-405, P-410, P-453, P-455, P-500, P-530, P-600, P-610, P-640, P-700, P-710, P-900.

[2]  The specific models in the Delta Series are the Delta 3, Delta 5, Delta 5.3, Delta 6.4, and a specialty Delta Series product, "Cards on the GO" CoG-1000 Multi-Technology Field Programmer. (Mihran Report ¶ 56.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**                    Date   April 13, 2012

Title   **HID Global Corp. et al. v. Farpointe Data, Inc.**

examines each claim in turn.

<u>Claim</u> <u>17</u>

Claim 17 discloses the following:

> A programmable interrogator for use with a plurality of transponders attached to an article to be identified, the interrogator for transmitting an interrogation signal for interrogating one of the plurality of transponders that respond to an interrogation signal by transmitting an identification signal having different frequencies, different methods of modulation, and at least an identification component, said one of the plurality of transponders receiving said interrogation signal from the interrogator and responding to said received interrogation signal was an identification signal, said interrogator comprising:

> an antenna assembly for transmitting the interrogation signal from the interrogator to said transponder and for receiving said identification signal from said transponder;

> a processor for processing said identification signal received by said transponder antenna assembly and creating an output signal substantially corresponding to said identification component of said identification signal; and

> a programmer connected to said processor for programming the specific types of identification signals of the different transponders to process.

('935 Patent, Declaration of Lisa A. Cole in support of Def.'s MSJ re Non-Infringement ("Cole Decl. re Non-Infringement"), Ex. A, Docket No. 169.)  HID

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**          Date   April 13, 2012

Title   **HID Global Corp. et al. v. Farpointe Data, Inc.**

Global asserts that certain models in Farpointe's Pyramid[3] and Delta[4] series infringe Claim 17.  The Court parses Claim 17 and addresses the arguments regarding each component individually.

1.   "<u>A programmable interrogator</u>"

In the Court's Claim Construction Order, the Court construed the term "programmable interrogator" to mean "an interrogator capable of being reprogrammed on site by reprogramming the interrogator software."  (Claim Constr., pp. 5-6, Docket No. 59.)  The Court understands "on site" to mean that the interrogator may be reprogrammed at the location in which it had been previously installed and used as part of an RFID system.  (Mihran Report ¶ 74.)

Farpointe argues that the accused readers do not read on Claim 17 because (1) the readers do not have programmers, and (2) the readers are not capable of being reprogrammed on site because to be reprogrammed they must be physically removed, sent to the manufacturing facility where they are connected to a computer through specialized programming equipment, and then sent back to the end-user for re-installation.  (Decl. of Scott Lindley ("Lindley Decl.") ¶ 3, Docket No. 167; Lindley Dep. 128:20-22, Cole Decl., Ex. G, Docket No. 150.)  The Court disagrees.

Farpointe's accused readers are "capable of being reprogrammed on site by reprogramming the interrogator software" using an Output Data Control Card ("Control Card").  It is undisputed that the Control Card can be used anywhere to enable or disable discrete features of the accused readers.  (Lindley Decl. ¶ 6; Mihran Report ¶¶ 76-81.)  For example, in Farpointe's literature on the Pyramid products, Farpointe states that the Control Cards are "programmed with special codes that instruct the Pyramid Proximity Readers to alter internal configuration

---

[3] The specific Pyramid products accused of infringing Claim 17 are the P-300, P-400, P-403, P-405, P-410, P-453, P-455, P-500, P-530, P-600, P-610, P-640, P-700, P-710, and P-900.  (Pls.' MSJ re Infringement, Ex. A.)

[4] The specific Delta products accused of infringing Claim 17 are the Delta 3, Delta 5, Delta 5.3, Delta 6.4, and the CoG-1000.  (Pls.' MSJ re Infringement, Ex. A.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date  April 13, 2012 |
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** | |

settings in order to perform specific tasks." (Lindley Dep., Ex. 53, Pls.' App. of Exs. in support of MSJ re Infringement, Docket No. 157.) While it may be Farpointe's general practice to prevent end-users from using the Control Cards to reprogram readers on site, Farpointe's expert, Mr. Roger Stewart, confirms that the Control Cards–also known as "programming cards"–are capable of reprogramming readers on site. During Mr. Stewart's deposition, he testified that the Control Cards "are designed to be used to customize [the interrogator] in a factory . . . They are not intended–and Farpointe goes to significant efforts to make sure that people do not <u>program</u> them on site." (Deposition of Roger Green Stewart ("Stewart Dep."), p. 12 at 108:12-18, Oines Decl., Ex. A [under seal], Docket No. 267) (emphasis added). This statement shows that it is Mr. Stewart's professional opinion that the Control Cards are <u>capable</u> of reprogramming the accused readers on site, even if Farpointe takes measures to prevent that. Mr. Stewart further testified that some Control Cards can enable or disable HID functionality in the readers. (<u>Id.</u> p. 10 at 81:18-25.) While enabling and disabling reader functionality may be a rudimentary form of "reprogramming," it nonetheless meets the minimum of the claim language. The Court declines to adopt Farpointe's overly narrow definition of "reprogramming of software" as requiring "some modification or loading of new or additional software code into the device." (Def.'s MSJ re Infringement, p. 16.) Farpointe offers no support for this proposed definition, which unduly limits the plain meaning of the claim language.

Furthermore, the Court rejects Farpointe's argument that the Control Cards do not reprogram readers on site because the Control Cards are not distributed to end-users. (<u>Id.</u>; Lindley Decl. ¶ 7.) That Farpointe seeks to prevent end-users from reprogramming readers on site has no bearing on whether the readers are "capable" of being reprogrammed on site. Farpointe cannot avoid infringement by controlling end-user behavior with technology that literally reads on the claim language.

With respect to the P-600 and P-700 Pyramid readers, there is a triable issue of fact as to whether they are "programmable interrogators." Farpointe President Scott Lindley stated that the P-600 and P-700 products each contain a microprocessor that is programmed only at the time the unit is manufactured, and that these readers are not capable of using any Control Cards. (Lindley Decl. ¶ 10.) However, Farpointe's Data Sheets for the P-600 and P-700 Pyramid Readers

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date    April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

appear to be inconsistent with Mr. Lindley's declaration, as they state that these readers are "Configurable via Control Cards." (Pls.' App. of Exs. in support of MSJ re Infringement, Ex. 35, p. 136, Ex. 37 p. 142.) Thus, there is a genuine issue as to whether the P-600 and P-700 readers have the capacity to be reprogrammed via a Control Card or otherwise.

Accordingly, the Court finds that the accused readers, except for the P-600 and P-700, constitute "programmable interrogators" as described in Claim 17. There is a genuine dispute as to whether the P-600 and P-700 devices constitute "programmable interrogators."

2. <u>"Attached to an article to be identified"</u>

The Court next determines whether the accused readers can be used with transponders "attached to an article to be identified."

Farpointe contends that the accused readers do not meet this claim language for two reasons. First, the transponders used with the accused products are freely transferrable. (Defs.' MSJ re Noninfringement, p. 8.) Mr. Stewart opines that "attached" in the context of this claim language requires the transponder to be "permanently and persistently" attached to the article to be identified. (Stewart Dep.,p. 19 at 132:11-25.) To support that position, Farpointe looks to the patent prosecution of Claim 17 and argues that the change in the claim language from "identification transponder" to "transponders attached to an article to be identified" shows that the addition of "attached" was intended to narrow the claim. (Defs.' MSJ re Noninfringement, p. 7.) Mr. Stewart cautions the Court against construing the term "attach" broadly as to include "carried" or "held by" because, he argues, such a construction would render the limitation meaningless, as a transponder must always be at least carried or held to be presented to the interrogator. (Expert Report of Roger G. Stewart ("Stewart Report"), Cole Decl., Ex. E., p. 15.) Second, Farpointe argues that the transponders used with the accused readers are not intended to identify the person possessing them. (Defs.' MSJ re Noninfringement, p. 8.) Mr. Stewart contends that the transponders are designed to allow or deny access to people based on presentation of the card to the reader, not the identity of the person presenting the card. (Stewart Report, p. 15.) Because the cards are not permanently or persistently attached to an article to be identified, Farpointe argues,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

the accused readers do not meet this claim language.

The Court finds that the transponders used with the accused readers are "attached to an article to be identified" because there is a logical connection between the card and the cardholder. That is, possession of a card reflects an identifying characteristic of the cardholder: that he or she has access to the area restricted by an RFID security system. Moreover, in the RFID field, "attached" does not necessarily connote physical attachment. (Rebuttal Expert Report of Richard T. Mihran ("Mihran Rebuttal Report") ¶ 38, Mihran Decl., Ex. B, Docket No. 149.) For example, in a patent mentioned in the '935 Patent, U.S. Patent No. 5,041,826 ("'826 Patent"), the patentee uses "attached" and "carried by" interchangeably in describing a tag. ('935 Patent at col. 1:15-22.) Further, U.S. Patent No. 5,347,263 to Carroll ("Carroll Patent"), which Mr. Stewart contends anticipates the '935 Patent, also demonstrates the use of the term "attached" to signify the logical connection between the card and the cardholder. The Carroll Patent states that transponders are "placed on, or carried by" objects, animals, or persons, and then the Patent indicates that the transponder is "attached" to the object, animal, or person on which the transponder has been placed. (Carroll Patent at col. 1:22-37.) Thus, this Patent suggests that in the RFID art, "attached" broadly encompasses transponders that are "placed on" or "carried by" an article to be identified. Accordingly, a card may be "attached" to a person carrying it on his or her person or affixing it to his or her clothing. Moreover, Mr. Stewart notes that "Farpointe readers work equally well whether the transponder is attached, just held in the hand, or stored in a pocket." (Stewart Report, p. 15.) Nothing in the claim language suggests that attachment requires a permanent or persisting physical connection between the card and object to be identified. The suggestion that the claim carries these implicit requirements is an improper attempt to import limitations on the claim language. To the extent that Mr. Stewart's opinion amounts to a claim construction, the issue is for the Court and there is no material issue of fact. Markman v. Western Instruments, Inc., 517 U.S. 370, 372 (1996).

Furthermore, Farpointe's patent prosecution argument is unconvincing because the Examiner for the '935 Patent merely noted that it was not clear whether "said transponder" referred to a plurality of transponders or a specific transponder. (Patent Prosecution, Cole Decl., Ex. B, p. 70, Docket No. 168.) The patentee amended the reference to "said" transponder to eliminate the vagueness

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**          Date   April 13, 2012

Title   **HID Global Corp. et al. v. Farpointe Data, Inc.**

noted by the Examiner and made a few additional edits unrelated to the Examiner's notes, such as adding "attached." (Patent Prosecution, p. 85-87.) Nothing about the addition of "attached" changes the Court's analysis of this element.

Accordingly, the Court finds that there is no genuine dispute that the accused products utilize transponders "attached to an article to be identified." Farpointe's arguments to the contrary are predicated on overly narrow constructions of the claim language.

> 3.   "One of the plurality of transponders that respond to an interrogation signal by transmitting an identification signal having different frequencies, different methods of modulation,"

At issue in this claim language is whether the accused readers respectively operate with a plurality of transponders using "different frequencies."[5]

The evidence shows that the transponders used with the accused products utilize different frequencies. First, Farpointe does not dispute that HID transponder send data bits at a frequency of 1.25 kbps, which is approximately half the frequency at which Farpointe transponders send data. (Mihran Report ¶ 118.) HID transponders utilize a bit cell duration corresponding to 100 cycles of the interrogator frequency. (Id.) As a consequence of the HID transponders' encoding, the maximum period of time that F1 or F2 is maintained before transitioning to the other frequency during transmission of data is one bit cell duration. (Id. ¶ 119.) In contrast, the Farpointe Pyramid transponders, which utilize NRZ encoding, have long data strings of 1's or 0's that will correspond to relatively low frequencies of transitions between F1 and F2 because the bit is being encoded directly by the presence of either F1 or F2. (Id. ¶ 120.) Thus, the frequencies used by the HID and Farpointe Pyramid transponders are different. (Id.) Second, the specification of the '935 Patent confirms that the "frequencies" in Table 2 are derived at least from different bit rates and transmission rates used

---

[5] Farpointe maintains that methods of encoding are separate and distinct from methods of modulation, but concedes that in accordance with the Court's Claim Construction, Farpointe and HID transponders use different data encoding methods and therefore, "different methods of modulation." (Defs.' Opp. to Pls.' MSJ re Infringement, p. 11.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

by the different transponders. ('935 Patent, col. 7:1-15.) As the Court already
noted in the Claim Construction, Table 2 of the '935 Patent lists the frequencies of
the various transponder signals for the corresponding transponders. (Claim
Constr., p. 7.) Thus, contrary to Farpointe's assertion that the rate of data
transmission does not affect the frequency of the transponder signals, the Court
finds that the transponders used by the accused products utilize "different
frequencies," and therefore meet the claim language.

In sum, the accused products read on the "different frequencies" requirement
of Claim 17.

4.    "An antenna assembly"

The Court also finds that the accused products contain "an antenna
assembly."  Though Farpointe argues that "an antenna assembly" must be
something more than a simple antenna, this is at odds with the plain language of
the '935 Patent and Farpointe's own expert witness report.  First, nothing in the
claim language suggests that a simple antenna could not meet the "antenna
assembly" requirement.  Even if the "antenna assembly" was intended to mean
anything more than a simple coil, at most it would merely include whatever items
are used to assemble the coil to the rest of the reader and connect it to the reader
electronics.  This is illustrated by the specification of the '935 Patent, which
describes a possible "antenna assembly" as including, in addition to the antennas, a
bobbin, an adjustable ferrite plug, and a foam padding used to fastened the antenna
to the coil. ('935 Patent, col. 5:19-22.)  Furthermore, whatever fastening material
the accused products use to secure the antennas to the rest of the coil satisfies this
claim language.  Contrary to Farpointe's assertion, the "antenna assembly" need
not "perform the antenna function."  Requiring that the "antenna assembly" have a
particular functionality imposes a limitation on the claim that is at odds with its
plain meaning.

Second, Mr. Stewart opines that a single coil antenna satisfies the "antenna
assembly" element.  For example, in Mr. Stewart's invalidity analysis, he argues
that the reader coil of the Beigel Patent is "physically exactly the same thing as the
'antenna assembly' described and claim in the '935 Patent," (Stewart Report, p.
18), and at Mr. Stewart's deposition, he stated that figure 1 of the Beigel Patent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**                     Date   April 13, 2012

Title   **HID Global Corp. et al. v. Farpointe Data, Inc.**

disclosed a simple coil reader antenna, (Stewart Dep., Oines Decl., Ex. A, pp. 26-27 at 177:23-178:25).  Moreover, Mr. Stewart agreed with HID Global counsel that a "simple coil antenna is . . . an antenna assembly as described and claimed in the '935 patent."  (Id. at p. 178: 17-21.)  Thus, Mr. Stewart agrees that a simple coil antenna meets the requirement of an "antenna assembly."

Accordingly, there is no genuine dispute of material fact that the accused products read on the "antenna assembly" requirement.

     5.     "A processor for processing said identification signal received by said transponder antenna assembly"

The dispute over this element is predicated on an obvious drafting mistake.  Though the Claim states that the signal is received by a "transponder antenna assembly," it is clear that the Patent should state that the signal is received by an "interrogator antenna assembly."  Indeed, even Mr. Stewart agreed during his deposition that "transponder antenna assembly" was a mistake in the claim language and that the claim was most likely intended to refer to the "interrogator antenna assembly."  (Stewart Dep., pp. 28-29 at 179:8-180:8.)  Mr. Stewart also recognized that Claim 17 actually calls for a "transponder antenna assembly" when he opined that the Beigel Patent disclosed the element "processing said identification signal received by said (transponder) antenna assembly."  (Stewart Report, p. 19.)  Mr. Stewart added the parentheses around the word "transponder" to indicate that "interrogator" was the proper term that should have been used in the claim language, and he confirmed as much at his deposition.  (Stewart Dep., pp. 28-29 at 179:8-180:8.)  Dr. Mihran also agrees that "transponder antenna assembly" was clearly intended to refer to "interrogator antenna assembly." (Mihran Report ¶¶ 180-195.)

Looking at the language of the '935 Patent, it is also evident that "transponder antenna assembly" should read "interrogator antenna assembly."  The antecedent basis for "said transponder antenna assembly" is the "antenna assembly for transmitting the interrogation signal from the interrogator to said transponder and receiving said identification signal from said transponder," thus showing that the "antenna assembly" is part of the interrogator–not the transponder.  (Claim 17) (emphasis supplied).  Additionally, several other portions of the '935 Patent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date   April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

specification and claims confirm the "identification signal" is sent by the transponder and received by the interrogator antenna assembly, further showing that "transponder antenna assembly" was an obvious mistake in the claim language.  (Abstract, col. 2:8-14, 25-26, 41-47; col. 13:22-28; col. 14:6-11.)

The Court may correct an error in a patent claim if "(1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."  Novo Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348, 1354 (Fed. Cir. 2003).  Because the claim language and specification undisputedly support the correction and the prosecution history does not suggest a different interpretation of "transponder antenna assembly" other than "interrogator antenna assembly," the correction is appropriate.

In light of the correction, Farpointe's noninfringement position is untenable with respect to this element because Farpointe concedes that the accused products "have a processor that processes an identification signal received by the interrogator."  (Defs.' MSJ re Noninfringement, p. 11; see also Mihran Report ¶¶ 180-195) (finding that each of the Pyramid and Delta products include a processor for processing said identification signal received by said interrogator antenna assembly).)

In sum, the accused products satisfy this element of Claim 17.  Because there is no genuine dispute of facts as to whether the accused products read on each of the elements of Claim 17, the Court finds that the accused products infringe Claim 17 as a matter of law.  Accordingly, HID Global is entitled to summary judgment regarding infringement of Claim 17 for all of the accused products except the P-600 and P-700, for which there is a triable issue of fact as to whether they constitute "programmable interrogators."

Claim 18

Claim 18 discloses "[t]he programmable interrogator of claim 17, wherein said programmer includes an EEPROM coupled to a microprocessor, said EEPROM being programmed by an external computer."  HID Global alleges that the same Farpointe products accused of infringing Claim 17 also infringe

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

dependent Claim 18. (Pls.' MSJ re Infringement, Ex. A.) Because the accused products, except the P-600 and the P-700, infringe Claim 17, the first part of Claim 18 is satisfied.

HID Global argues that the accused products read on Claim 18 because the readers include an EEPROM coupled to a microprocessor that may be programmed in part by the presentation of a Control Card. (Pls.' MSJ re Infringement, p. 19; Mihran Report ¶¶ 231-33.) HID Global asserts–and Farpointe does not dispute–that Control Cards such as ones used with the accused products are commonly configured with the desired programming command data by using an external computer. (Mihran Report ¶¶ 231-33.) Moreover, nothing in the claim language requires that the external computer be physically connected to the EEPROM. Indeed, the patentee contemplated that the reader may be programmed in the field through a serial port "which may be linked to a computer by either hardware, RF, or the like." ('935 Patent, col. 5:8-13.)

HID Global has presented sufficient evidence to show that the accused products read on Claim 18. Farpointe has not challenged this evidence or offered any countervailing arguments. Accordingly, HID Global is entitled to summary judgment regarding the infringement of dependent Claim 18.

Claim 19

Claim 19 discloses the following:

> The programmable interrogator of claim 18, wherein said processor includes a mixer for demodulating the identification signal, when said identification signal is formed of at least one of different frequencies, variable phases and intervals, to form a demodulated signal, said mixer transmitting said demodulated signal to at least a first channel and a second channel.

HID Global alleges that the Delta 3, 5, 5.3, 6.4, and CoG-1000 infringe Claim 19. (Pls.' MSJ re Infringement, Ex. A.) The central dispute in this Claim is whether the accused products contain a "mixer for demodulating the identification signal."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **SACV 10-1954 JVS (RNBx)**          Date    April 13, 2012

Title       **HID Global Corp. et al. v. Farpointe Data, Inc.**

Dr. Mihran asserts that the processor of the Delta series readers includes an
NXP CLRC632 Multiple protocol contactless reader IC (the "NXP Reader IC")
that performs demodulation of the identification signal.  (Mihran Report  ¶ 237.)
The NXP Reader IC is used as part of the processing of the 13.56 MHZ
transponder signals.  (Id. (citing Ex. 42 at FAR012978).)  Further, the NXP Reader
IC provides analog processing circuitry for "demodulating and decoding card label
response."  (Id. ¶ 238 (citing the Data Sheet for the NXP Reader IC at HID001107-
1232).)  The circuitry includes a quadrature demodulator.  (Id. (citing § 9.10 of
Data Sheet for NXP Reader IC).)  Dr. Mihran opines that quadrature demodulation
is well known to those of skill in the art to utilize one or more mixers.  (Id.)
Moreover, Dr. Mihran states that the quadrature demodulator in the NXP Reader
IC utilizes a mixer to mix an in-phase clock (I-clock) and a 90-degree out-of-phase
clock (Q-clock) with the identification signal applied to the Rx input pin.  (Id.)
While Farpointe argues that Dr. Mihran merely assumes the conclusion to be
proven by asserting that the NXP Reader IC utilizes a mixer, Farpointe does not
bring forth any evidence to rebut Dr. Mihran's analysis of the NXP Reader IC.
(Defs.' Opp. to Pls.' MSJ re Infringement, pp. 19-20 (citing Mihran Report ¶ 239).)
Moreover, the Court finds Dr. Mihran's conclusions to be reliable and corroborated
by credible evidence Farpointe produced.

Farpointe further argues that even if the I and Q demodulators Dr. Mihran
points to do in fact include a mixer, it would be connected only to one channel.
(Defs.' Opp. to Pls.' MSJ re Infringement, p. 20 (citing Mihran Decl., Ex. A at
HID00110[6]).)  The evidence Farpointe cites, however, demonstrates that the mixer
is connected to at least a first and second channel.  As shown in the receiver circuit
block diagram of the NXP Reader IC (HID00110), the output of the 13.56 MHZ
demodulator comprises two channels, and correlation circuitry in turn provides two
additional channels of output for each of the Q- and I- channel inputs.  (Id. ¶ 241
(citing § 9.10.2.3 of Data Sheet for NXP Reader IC).)  Thus, the mixer in the
accused products transmits a demodulated signal to at least a first channel and a

---

[6] "HID001110" is an insufficient pincite because Exhibit A contains several hundred pages and
they are not paginated consecutively according to a "HID00_" Bates stamp.  The Court is unable to
locate this document, but it evaluates the reproduction of the block diagram disclosing the NXP Reader
IC at Mihran Report, paragraph 240.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**                    Date   April 13, 2012

Title   **HID Global Corp. et al. v. Farpointe Data, Inc.**

second channel, as required by Claim 19.  (Id. ¶ 242.)[7]

In sum, the accused products contain mixers that read on Claim 19. Accordingly, HID Global is entitled to summary judgment regarding infringement of this Claim 19.

In conclusion, HID Global is entitled to summary judgment regarding infringement of Claims 17 and 18 for all of the accused products except the P-600 and P-700.  HID Global is entitled to summary judgment regarding infringement of Claims 18 for all the accused products.  Farpointe's Motion for Summary Judgment regarding Infringement is denied.

3.   **'862 Patent**

HID Global alleges that certain Delta products infringe Claims 1, 2, 3, 4, 5, 6, 9, 10, 13, 14, 16, 17, 19, 20, 21, 22 of the '862 Patent.  (Pls.' MSJ re Infringement, Ex. A.)  The Court separately addresses each independent claim along with its dependent claims.

Claims 1-4

HID Global alleges that the Delta 5 and 6.4 infringe Claims 1 through 4. (Pls.' MSJ re Infringement, Ex. A.)  Independent Claim 1 discloses the following:

An antenna array for an RFID reader comprising:

a first reader antenna tuned to operate at a first low carrier frequency enabling data communication with a first transponder transmitting data signals at said first low carrier frequency; and

a second reader antenna tuned to operate at a second high carrier frequency enabling data communication with a second

---

[7] Farpointe does not offer a competing interpretation of NXP Reader IC block diagram.  Rather, Farpointe cites the diagram without any analysis.  Accordingly, the Court defers to Dr. Mihran's explanation of this diagram.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**          Date   April 13, 2012

Title      **HID Global Corp. et al. v. Farpointe Data, Inc.**

transponder transmitting data signals at said second high carrier
frequency, wherein the first and second antennas are oriented
along axes that are substantially parallel to one another.

Farpointe does not dispute that the accused products have a "first reader antenna
tuned to operate at a first low carrier frequency enabling data communication with
a first transponder transmitting data signals at said first low carrier." (Defs.' Opp.
to Pls.' MSJ re Infringement, p. 5.) Thus, the first part of Claim 1 is satisfied. At
issue is (1) whether the transponders in the accused products transmit data signals
at the same carrier frequency as the exciter signals generated by the second high
frequency antennas; and (2) whether the first and second antennas are oriented
along axes that are substantially parallel to one another.[8]

First, Farpointe argues that the accused products do not meet Claim 1
because the transponders in the accused products do not transmit data signals at the
same high carrier frequency used by the second reader antennas. Farpointe reasons
that because the transponder transmits subcarrier signals at a different frequency
than the exciter frequency generated by the high frequency antenna, the
transponder and antenna do not transmit data at the same "high carrier frequency."
(Defs.' Opp. to Pls.' MSJ re Infringement, p. 6.) However, even if the accused
products utilize <u>subcarrier</u> signals with frequencies different from the exciter
signal, Farpointe does not dispute that the accused products utilize a 13.56 MHZ
<u>carrier</u> signal, which is the same frequency as the exciter signal.

The frequency of the subcarrier signals is irrelevant to the infringement
analysis because the Claim requires only that the antenna and transponder
communicate at the same high carrier frequency. As Dr. Mihran explains, an RFID
system can employ multiple levels of modulation through the use of subcarrier
signals, which can operate at different frequencies from the carrier signal. (Mihran
Report ¶¶ 38-44; <u>see</u> Finkenzeller's RFID Handbook § 6.2.4, fig. 6.12, Pls.' App.

---

[8] Mr. Stewart raises a third dispute over Claim 1 in his Rebuttal Report, asserting that the Claim
requires simultaneous data communication between the high and low frequency antennas and the
transponders. (Stewart Rebuttal Report, p. 19.) Mr. Stewart, however, cites no support for this
assertion, and Farpointe does not include this argument in its pleadings. Moreover, nothing in the claim
language imposes a temporal limitation on when the data communications must occur.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

of Exs., Ex. 12 (illustrating that a subcarrier signal can operate at one frequency while the carrier signal operates at another).) Thus, the accused products can operate with a carrier signal frequency of 13.56 MHZ while utilizing subcarrier signals of differing frequencies. Indeed, the transmission of carrier signals is independent of any particular subcarrier that Farpointe may employ. (Mihran Report ¶ 126.) The observation by Farpointe's Vice President Kirk Bierach that data may be transferred at the lower subcarrier rates is beside the point. (Decl. of Kirk Bierach ("Bierach Decl.") ¶ 12, Docket No. 225.) Modulation of the subcarrier signals does not avoid literal infringement of the Claim. When a claim is introduced by the signal "comprising," "infringement is not avoided by the presence of elements or steps in addition to those specifically recited in the claim." <u>Vivid Techs., Inc. v. Am. Science & En'g, Inc.</u>, 200 F.3d 795, 811 (Fed. Cir. 1999). Therefore, Farpointe does not avoid infringement by employing subcarrier signals utilizing different frequencies than the carrier signal disclosed in the Patent and used in the accused product.

Second, Farpointe argues that the first and second antennas in the accused products are not "oriented along axes that are substantially parallel to one another." In the Claim Construction Order, the Court construed this term to mean "the first and second antennas are oriented along longitudinal axes substantially equidistant from each other." (Claim Constr., p. 15-17.) The Court also concluded that the "longitudinal axis" is the axis that is perpendicular to the plane defined by the antenna loop. (<u>Id.</u> at p. 16.) Mr. Stewart contends that Claim 1 requires the one and second antennas to be on different planes in order to be oriented along "substantially parallel" axes. (Stewart Rebuttal Report, Oines Decl, Ex. B, p. 19.) Mr. Stewart opines that because the accused products have antennas that are coplanar (on a single plane), they are oriented along only a single longitudinal axis, and thus cannot have axes that are "substantially parallel." (<u>Id.</u>) Mr. Stewart's analysis, however, would be correct only if the "longitudinal axis" was the axis <u>parallel</u> to the plane defined by the antenna loop. The Court previously declined to adopt that construction and found that the longitudinal axis is the axis <u>perpendicular</u> to the plane defined by the antenna loop. (Claim Constr., p. 16.) Moreover, as x-rays of both accused products show, the centers of the first and second antennas are located on different longitudinal axes that are substantially parallel to one another. (Mihran Decl. ¶¶ 261-262 [x-ray of Delta 5 reader], ¶¶ 265-266 [x-ray of Delta 6.4 reader]; Pls.' App. of Exs., Ex. HID1104-1106.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **SACV 10-1954 JVS (RNBx)**                    Date    April 13, 2012

Title    **HID Global Corp. et al. v. Farpointe Data, Inc.**

While the accused products are oriented on different, substantially parallel longitudinal axes, it seems clear from Figure 4 of the Patent specification that antennas oriented along the same longitudinal axis would also satisfy this claim requirement.  Indeed, two antennas oriented along the same longitudinal axes are "substantially parallel," as two axes that are the same are parallel.  Thus, even if Mr. Stewart were correct in concluding that the accused products are oriented along the same longitudinal axis, the accused products would nevertheless read on the Claim.[9]

Because the accused products have transponders and antennas that communicate at the same carrier frequency and because the first and second antennas are oriented along substantially parallel longitudinal axes, the accused products read on Claim 1 of the '862 Patent.

The accused products also infringe dependent Claims 2, 3, and 4 because they satisfy Claim 1 and meet the discrete requirements of the dependant Claims. Claim 2 provides: "The antenna array of claim 1, wherein said first low carrier frequency is nominally 125 kHz."  Dr. Mihran opines that this Claim is satisfied, (Mihran Report ¶ 269), Farpointe does not dispute that conclusion.  Claim 3 discloses: "The antenna array of claim 1, wherein said second high carrier frequency is about 13.56 MHZ."  Dr. Mihran concludes that the accused products read on Claim 3, and Farpointe does not dispute this.  Claim 4 states: "The antenna array of claim 1, further comprising a reader housing containing said first and second antennas."  Dr. Mihran finds that the accused products include reader housings containing the first and second antennas, thus meeting the requirement of Claim 4.  (Mihran Report ¶¶ 273 (citing Lindley Dep. at 23:20-24:7).)  Farpointe does not challenge this.  Farpointe argues that Claims 2 through 4 are not met by the accused products because they do not read on Claim 1, and thus they cannot read on Claim 1's dependent claims.  Because the Court finds that the accused products meet Claim 1, Farpointe's argument regarding the dependent claims fails.

In sum, the accused products literally infringe Claims 1 through 4. Accordingly, HID Global is entitled to summary judgment regarding infringement

---

[9] Note that the Court has previously declined to adopt Farpointe's construction of "parallel axes" as axes that "are separated from each other and do not intersect."  (Claim Constr., p. 17.)  Thus, the Court's construction left open the possibility that parallel axes need not be separate from one another.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

with respect to these claims.

                        Claims 5 and 6

HID Global alleges that Delta 3, 5.3, and 6.4 infringe independent Claim 5 and dependent Claim 6.  Claim Five discloses the following:

> An antenna array for an RFID reader comprising:
>
>  a first reader antenna tuned to operate at a first carrier frequency enabling data communication with a first transponder transmitting data signals at said first carrier frequency; and
>
>  a second reader antenna tuned to operate at a second carrier frequency different from said first carrier frequency enabling data communication with a second transponder transmitting data signals at said second carrier frequency, wherein <u>said first and second antennas are arranged in at least a partially overlapping arrangement on proximate adjacent planes</u>.

 (emphasis supplied).  The language of Claim 5 is almost identical to Claim 1, except for the portion underlined above.  The accused products meet the first part of the Claim 5 that echoes Claim 1 because each of the products include an antenna tuned to operate at 125 kHz to enable data communication with a transponder that operates at that frequency, and an antenna tuned to operate at 13.56 MHZ to enable data communication with a transponder tuned to operate at that frequency. (Mihran Decl. ¶¶ 275-276.)

The parties dispute the portion of the Claim underlined above.  The Court previously construed the underlined language as follows: "first and second antennas arranged so that one antenna may be brought into contact with the other antenna at some point of rotation if one (or both) antenna (antennas) were rotated about its (their) respective center (centers) of mass, the antennas contained within respective planes before rotation in their positions that are near, close, or contiguous."  (Claim Constr., p. 18.)  Mr. Stewart argues that Claim 5 requires that the antennas reside on separate planes to be in a "partially overlapping

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

arrangement." (Stewart Rebuttal Report, p. 18.) Thus, Mr. Stewart concludes, the coplanar antenna arrangements in the accused products do not infringe Claim 5. (Id.) However, during Claim Construction, the Court rejected the argument that Claim 5 requires that the antenna loops be on separate planes. (Claim Constr., p. 19.) In other words, the Claim Construction and the Claim itself leaves open the possibility that coplanar antennas could meet the requirement of Claim 5. Indeed, the Court interpreted "proximate adjacent planes" to include planes that are "near, close, or contiguous," thereby contemplating a coplanar antenna arrangement. Moreover, undisputed evidence of the antenna configurations in the Delta 3, 5.3, and 6.4 shows that in each accused product, (1) the antennas are contained within respective planes before rotation in their fixed position that are near, close, or contiguous and (2) that if either of the two antennas are rotated about their respective centers of mass, one antenna may be brought into contact with the other antenna at some point in the rotation. (Mihran Report ¶¶ 277-289; Pls.' App. of Exs., Ex. 21, p. 3 [Delta 3 and 5.3], Ex. 22, pp. 2-3 [Delta 5], Ex. 23, pp. 12-13 [Delta 6.4].)[10]

Accordingly, the accused products literally infringe Claim 5 and HID Global is entitled to summary judgment on this claim.

Dependent Claim 6 provides that, "[t]he antenna array of claim 5, further comprising a reader housing containing said first and second antennas." Images of the accused products show that they include a reader housing containing the first and second antennas. (Mihran Report ¶¶ 277-289; Pls.' App. of Exs., Ex. 21, p. 3 [Delta 3 and 5.3], Ex. 22, pp. 2-3 [Delta 5], Ex. 23, pp. 12-13 [Delta 6.4].) Moreover, Farpointe does not bring forth any evidence to challenge the discrete requirements of Claim 6. Therefore, the accused products also infringe Claim 6.

In sum, HID Global is entitled to summary judgement regarding infringement of Claims 5 and 6.

Claims 9, 10, and 13

───────────────

[10] The Court largely relies on the reproductions of the exhibits in Dr. Mihran's Report because the photographs were illegible in the Plaintiff's Appendix of Exhibits.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **SACV 10-1954 JVS (RNBx)**              Date    April 13, 2012

Title       **HID Global Corp. et al. v. Farpointe Data, Inc.**

HID Global alleges that the Delta 3, 5, 5.3, 6.4, and the CoG-1000 infringe
independent Claim 9 and dependent Claim 10.  (Pls.' MSJ re Infringement, p. 8.)
HID Global asserts that the Delta 3, 5.3, and 6.4 infringe dependent Claim 13.  (Id.
at p. 9).  Claim 9 discloses the following:

> An antenna array for an RFID reader comprising:
>
> a first reader antenna tuned to operate at a first carrier
> frequency enabling data communication with a first transponder
> transmitting data signals at said first carrier frequency; and
>
> a second reader antenna tuned to operate at a second carrier
> frequency different from said first carrier frequency enabling
> data communication with a second transponder transmitting
> data signal at said second carrier frequency, <u>wherein said first
> and second antennas are arranged in an opposing magnetic flux
> arrangement.</u>

(emphasis supplied).  The language of Claim 9 is almost identical to Claim 5,
except for the portion underlined above.  Dr. Mihran opines that each of the
accused products infringe the elements of Claim 9 that repeat Claim 5 for the
reasons discussed in the Claim 5 analysis <u>supra</u>.  (Mihran Report ¶¶ 293-94.)
Farpointe does not set forth any evidence challenging Dr. Mihran's assertion.

The Court construed the language underlined above as follows: an
"arrangement where the magnetic flux generated by one reader antenna passes
through the other reader antenna in an opposing manner (i.e., both positive and
negative magnetic flux from one reader antenna passes through the other reader
antenna); positive magnetic flux is magnetic flux which induces a positive voltage
across an antenna coil and negative magnetic flux is magnetic flux which induces
negative voltage across an antenna coil."  (Claim Constr., pp. 21-22.)

The parties do not appear to dispute that the antennas in the accused
products are positioned in a magnetic flux arrangement.  Dr. Mihran opines that in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

the antenna coil arrangement of the Delta series readers,[11] where the first low frequency antenna is both substantially coplanar with and enclosed within the area of the second high frequency antenna, both positive and negative magnetic flux from the low frequency antenna will necessarily pass through the high frequency reader antenna, as required by Claim 6.  (Mihran Report ¶¶ 296-303 (citing RFID Handbook, figs. 4.12, 4.13 [movement of magnetic flux through magnetically coupled loops]; Pls.' App. of Exs., Ex. 82 [showing that the CoG-1000 also utilizes an arrangement wherein the low frequency antenna is substantially coplanar with and within the boundary of the high frequency antenna]).)  Farpointe does not offer any evidence challenging Dr. Mihran's assertion regarding the magnetic flux arrangement.

 While Farpointe does not dispute HID Global's construction of Claim 9, Farpointe argues that one of the accused products–the CoG-1000–does not infringe this Claim or any other claim in the '862 Patent because it is not an "RFID reader" within the meaning of the '862 Patent.  (Defs.' Opp. to Pls.' MSJ re Infringement, p. 2.)  The CoG-1000 is part of the Delta product series, (Lindley Dep., Oines Decl., Ex. C, p. 620 at 153:23-25), and it is capable of programming both 125 kHz proximity cards as well as 13.56 MHZ smart-card credentials, (Mihran Report ¶ 56).  An "RFID reader" within the meaning of the '862 Patent is a reader capable by itself of generating excitation signals and reading transponders.[12]  Dr. Mihran implicitly concludes that the CoG-1000 is an RFID reader within the meaning of the '862 Patent by concluding that the CoG-1000 infringes Claim 9.  (Mihran Report ¶ 306.)  Moreover, Dr. Mihran opines that the CoG-1000 "necessarily includes the ability to read the cards that they are capable of writing for confirmation of correct programming."  (Id.  ¶ 57.)  HID Global also relies on the testimony of Mr. Scott Lindley, Farpointe's 30(b)(6) witness, who testified that the CoG-1000 is "very similar to the Delta 5 reader" and has the same functionality as a Delta 5 reader.  (Lindley Dep. p. 620 at 153:23-154:8.)  Mr. Lindley further testified that the only differences between the CoG-1000 and the Delta 5 reader were that the CoG-1000 has a USB interface instead of a wiegand output like the Delta 5 reader, that the CoG-1000 has a larger 125 kHz coil, that the coil

---

[11] All of the readers accused of infringing this claims are Delta series readers.

[12] The Court's construction of "RFID reader" is discussed infra the invalidity analysis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

configuration is slightly different in the CoG-1000, and that the two products have different enclosures. (Id.) Given that Mr. Lindley testified that the CoG-1000 and Delta 5 readers have the "same functionality" and given the lack of significant differences in the hardware and software in the products, it appears that the CoG-1000 constitutes an "RFID reader" within the meaning of the '862 Patent. That is, this testimony suggests that the CoG-1000 product is an integral reader capable by itself of generating excitation signals and reading transponders; however, at the end of Mr. Lindley's deposition, the following exchange occurred:

Question: The question for you, Mr. Lindley, the CoG-1000 is a field programmer; correct?

Mr. Lindley: Yes

Question: What does a field programmer do?

Mr. Lindley: It programs Delta cards, Mifare cards, and 125 kilohertz Proximity cards.

Question: Anything else?

Mr. Lindley: No.

(Lindley Dep., p. 622 at 163:12-19.) Thus, from this exchange it is unclear whether Mr. Lindley meant that the only function of the CoG-1000 is to program certain cards or whether he meant that field programmers, along with other functions, are capable of programming only the specific cards he mentioned. Whether the CoG-1000 is capable by itself of generating excitation signals and reading transponders is a genuine issue of material fact that the Court cannot determine as a matter of law on the present record.

In sum, each of the accused products, except the CoG-1000, infringe Claim 9. There is a genuine issue of fact as to whether the CoG-1000 is an "RFID reader" within the meaning of the '862 Patent, and thus summary judgment cannot be afforded with respect to this device.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **SACV 10-1954 JVS (RNBx)**          Date    April 13, 2012

Title       **HID Global Corp. et al. v. Farpointe Data, Inc.**

Next, the Court turns to the dependent claims.  Claim 10 provides, "[t]he antenna array of claim 9, further comprising a reader housing containing said first and second antennas."  Dr. Mihran opines that this Claim is satisfied.  (Mihran Report ¶¶ 304-306 (citing Pls.' App. of Exs., Ex. 17).)  Farpointe does not challenge Mr. Mihran's assertions.  Accordingly, HID Global is entitled to summary judgment regarding infringement of Claim 10 for all the accused products except the CoG-1000.

Claim 13 discloses, "[t]he antenna array of claim 9, wherein said first and second reader antennas are arranged in an overlapping arrangement simultaneous with said opposing magnetic flux arrangement."  HID Global alleges that the Delta 3, 5.3, and 6.4 infringe this Claim.  (Pls.' MSJ re Infringement, Ex. A.)  For Claim 13, the Court adopted the constructions of "overlapping" and "opposing magnetic flux arrangement" from the constructions of Claim 5 and 9, respectively.  (Claim Constr., pp. 18-19.)  As discussed in the analysis of Claims 5 and 9, the accused products employ an "overlapping" configuration and an "opposing magnetic flux arrangement."  (See also Mihran Report ¶¶ 308-309.)  Further, Farpointe does not challenge HID Global's contention that the accused products satisfy this claim language.  Accordingly, the accused products infringe Claim 13.

              Claims 14 and 16

HID Global alleges that the Delta 5 and 6.4 infringe Claims 14 and 16.  Claim 14 discloses the following:

An RFID reader for an RFID system comprising:

 an antenna array including a first reader antenna tuned to operate at a first low carrier frequency enabling data communication with a first transponder transmitting data signals at said first low carrier frequency and a second reader antenna tuned to operate at a second high carrier frequency different from said first low carrier frequency enabling data communication with a second transponder transmitting data signals at said second high carrier frequency, wherein the first and second antennas are oriented along axes that are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

substantially parallel to one another; and

<u>a signal generator coupled with said first and second reader</u>
antennas.

(Emphasis supplied). Claim 14 is essentially the same as Claim 1, except as indicated by the underlined terms. Claim 14 discloses "an RFID reader for an RFID system" rather than "an antenna array for an RFID reader," and it includes "a signal generator coupled with said first and second reader antennas."

_____With respect to the "RFID reader for an RFID system," it is undisputed that each of the accused products is an RFID reader within the meaning of the '862 Patent. (Mihran Report ¶ 311.) Furthermore, the accused devices also include "a signal generator coupled with said first and second antennas," as the Delta series readers include two signal generators coupled to the first and second antennas to generate the 125 kHz and 13.56 MHZ interrogation signals that are transmitted to interrogate the transponders. (Id. ¶¶ 310-315; see also Pls.' App. of Exs., Ex. 42.) Farpointe does not challenge HID Global's assertions regarding Claim 14. Accordingly, the accused products infringe Claim 14, and HID Global is entitled to judgment on this Claim as a matter of law.

Dependent Claim 16 discloses the following:

The RFID reader of claim 14, wherein said signal generator includes a discrete first signal generator coupled with said first reader antennas for generating signals for transmission from said first reader antenna and a discrete second signal generator coupled with said second reader antenna separate from said discrete first signal generator for generating signals for transmission from said second reader antenna.

HID Global sets forth sufficient evidence to show that the accused products literally infringe Claim 16. Farpointe does not offer any rebuttal evidence. As discussed in the Claim 14 analysis, Dr. Mihran opines that the first and second signal generators used in the accused products are discrete from one another. (Mihran Report ¶ 317.) The low frequency signal generator utilizes a 20 MHZ

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|----------|------------------------------|------|----------------|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|-------|-----------------------------------------------------|

frequency reference in conjunction with the PIC microcontroller to generate the
125 kHz driver signal coupled to the first antenna.  (Id.)  The high frequency signal
generator uses a different or discrete 13.56 MHZ frequency reference and the NXP
Reader IC to generate the 13.56 MHZ signal coupled to the second antenna.  (Id.)
For these reasons, the accused products meet Claim 16.

In sum, HID Global has presented sufficient evidence to show that the
accused products infringe Claims 14 and 16, and Farpointe has failed to challenge
or refute this evidence.  Accordingly, HID Global is entitled to judgment on these
Claims as a matter of law.

<u>Claims 17 and 19</u>

HID Global alleges that the Delta 3, 5.3, and 6.4 infringe Claims 17 and 19.
(Pls.' MSJ re Infringement, pp. 10-11.)  Claim 17 discloses the following:

<u>An RFID reader for an RFID system comprising</u>:

an antenna array including a first reader antenna tuned to
operate at a first low carrier frequency enabling data
communication with a first transponder transmitting data
signals at said first low carrier frequency and a second reader
antenna tuned to operate at a second high carrier frequency
different from said first low carrier frequency enabling data
communication with a second transponder transmitting data
signals at said second high carrier frequency, wherein the first
and second antenna are arranged in at least a partially
overlapping arrangement alone proximate adjacent planes; and

<u>receiver electronics coupled with said first and second reader
antennas</u>.

Claim 17 is essentially the same as Claim 5, except as indicated by the underlined
terms.  Because the same products are accused of infringing Claims 5 and 17 and
because the accused products infringe Claim 5, all the elements of Claim 17 that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.    **SACV 10-1954 JVS (RNBx)**                    Date    April 13, 2012

Title    **HID Global Corp. et al. v. Farpointe Data, Inc.**

overlap with Claim 5 are satisfied.[13]

      With respect to the "RFID reader for an RFID system," it is undisputed that each of the accused products is an RFID reader within the meaning of the '862 Patent. (Mihran Report ¶ 311.)  Dr. Mihran opines that all of the accused products include receiver electronics coupled to each of the first and second antennas.  (Id. ¶¶ 321-27; see Pls.' App. of Exs., Ex. 42.)  Farpointe does not dispute Dr. Mihran's conclusions or set forth any evidence suggesting the accused products do not include receiver electronics coupled to the first and second antennas.  Accordingly, HID Global has sufficiently demonstrated that the accused products literally infringe Claim 17.

      Dependent Claim 19 provides:

> The RFID reader of Claim 17, wherein said receiver electronics includes discrete first receiver electronics coupled with said first reader antenna for conditioning signals received by said first reader antenna and discrete second receiver electronics coupled with said second reader antenna separate from said discrete first receiver electronics for conditioning signals received by said second reader antenna.

  The first and second receiver electronics used in the accused readers are discrete from one another, as discussed in the Claim 17 analysis. (Mihran Report ¶ 329.) The low frequency receiver electronics includes circuitry for detecting, amplifying, and filtering a modulated signal from a 125 kHz transponder, as well as converting the detected modulation components into digital pulses.  (Id.)  In other words, the receiver electronics condition the signal received by the first reader antenna.  (Id.; see Pls.' App. of Exs., Ex. 42.)  The high frequency receiver electronics is discrete from that of the low frequency receiver electronics, comprising the NXP Reader IC

---

[13] HID Global's opening brief for summary judgment regarding infringement claims that the Delta 5 also infringes Claims 17 and 19; however, HID Global notes in its reply brief that this was the result of a typographical error in Dr. Mihran's report.  Thus, the Court assumes that the Delta 5 was also listed erroneously in the infringement chart under Claims 17 and 19 in Exhibit A to the HID Global's opening brief.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**          Date   April 13, 2012

Title   **HID Global Corp. et al. v. Farpointe Data, Inc.**

used for conditioning the 13.56 MHZ signals received by the second antenna. (Id. ¶ 330.)  Thus, there is a separate set of receiver electronics that condition the lower frequency signal received by the second reader antenna. (Id.)  Because the accused products contain separate receiver electronics that condition the signals received by the respective first and second reader antennas, these products literally infringe Claim 19. (See id. ¶¶ 328-331.)  Farpointe does not set forth any evidence suggesting the elements of this Claim are not satisfied.

In sum, the accused products read on Claims 17 and 19, and thus HID Global is entitled to judgment as a matter of law with respect to infringement of these Claims.

<u>Claims</u> 20-22

HID Global alleges that the Delta 3, 5, 5.3, 6.4, and the CoG-1000 infringe Claims 20, 21, and 22. (Pls.' MSJ re Infringement, p. 11.)  Independent Claim 20 discloses the following:

An antenna array for an RFID reader comprising:

a first reader loop antenna having a first loop and tuned to operate at a first carrier frequency enabling data communication with a first transponder transmitting data signals at said first carrier frequency; and

a second reader loop antenna having a second loop and tuned to operate at a second carrier frequency different from said first carrier frequency enabling data communication with a second transponder transmitting data signals at said second carrier frequency, <u>wherein a first plane defined by the first area is substantially orthogonal to a direction of magnetic flux created through the first antenna, wherein a second plane defined by the second area is substantially orthogonal to a direction of magnetic flux created through the second antenna, wherein said first and second loops are arranged relative to one another such that a portion of the first area in the first plane overlaps a</u>

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.     **SACV 10-1954 JVS (RNBx)**                    Date     April 13, 2012

Title        **HID Global Corp. et al. v. Farpointe Data, Inc.**

portion of the second area in the second plane.

 Claim 20 is similar to Claims 1 and 9, except it discloses first and second "loop" antennas, and provides the portion underlined above.  It is undisputed that each of the accused devices use conventional loop antennas.[14]  (Mihran Report ¶ 333.) HID Global offers sufficient evidence to show that the accused products meet each element of Claim 20; Farpointe does not offer any evidence to challenge HID Global's assertions regarding Claim 20.

        First, HID Global presents evidence that the orthogonal arrangement requirement is satisfied.  (Mihran Report ¶ 335.)  Dr. Mihran explains that the general path of magnetic flux lines in the vicinity of each of the two coil antennas as used in the Delta series readers is well known in the RFID art.  (Id. ¶ 335 (citing Finkenzeller RFID Handbook p. 63, Fig. 4.3).)  For the Delta reader antenna coils, the direction of the magnetic flux lines produced by a coil antenna inside the area circumscribed by the windings is substantially orthogonal to the plane defined by the loop antenna area, as depicted in Figure 4.3 of the Finkenzeller RFID Handbook.  (Id. ¶ 336.)  Thus, the loop antennas used in the Delta series satisfy this limitation.  (Id.)

        Second, HID Global presents evidence that the "first and second loops are arranged relative to one another such that a portion of the first area in the first plane overlaps a portion of the second area in the second plane," as required by Claim 20.  The Court previously construed this element of the Claim to mean "a portion of the area enclosed by the first reader loop antenna covers or is covered by a portion of the area enclosed by the second reader loop antenna as viewed along the longitudinal axis." (Claim Constr., p. 22.)  As discussed supra, the antennas in the accused products are coplanar, and thus an area enclosed by the first reader loop antenna covers or is covered by a portion of the area enclosed by the second reader loop antenna.  (Mihran Report ¶¶ 330-340; see Pls.' App. of Exs., Ex. 21, p. 3 [Delta 3 and 5.3], Ex. 22, pp. 2-3 [Delta 5], Ex. 23, pp. 12-13 [Delta 6.4].)

        Accordingly, the accused products other than the CoG-1000 meet all the

_____

        [14] Though Farpointe does not explicitly dispute this element, Farpointe disputes that the CoG-1000 satisfies any part of the '862 Patent because it asserts that the CoG-1000 is not an RFID reader.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

elements of Claim 20, and thus literally infringe this Claim.

HID Global also presents sufficient evidence that the accused products infringe dependent Claims 21 and 22.   Claim 21 discloses, "[t]he antenna array of claim 20, wherein the directions of magnetic flux created through the first and second antennas are not orthogonal."  As discussed supra, when antennas are configured in a substantially coplanar arrangement, the magnetic flux created through the first and second antennas is substantially parallel, and therefore the magnetic fluxes "are not orthogonal."  (Mihran Report ¶ 342; RFID Handbook, fig. 4.3.)  Farpointe does not challenge this evidence.  Accordingly, the accused products, except the CoG-1000, read on Claim 21.  Claim 22 provides, "[t]he antenna array of Claim 20, wherein said first and second loops have a parallel orientation and are arranged relative one another such that a size of the portion of the first area aligning with the portion of the second area is less than at least one of a size of the first area and a size of the second area."  Dr. Mihran opines that each of the first low frequency antennas in the accused products lie within the area circumscribed by the loops of the high frequency antenna when viewed along the axis of the antennas.  (Mihran Report ¶ 344.)  Thus, the "size of the portion of the first area aligning with the portion of the second area" is equal to the size of the first antenna area.  (Id.)  Since the first antenna area is necessarily less than the area of the second, larger antenna, the claim limitation is met.  (Id.)  Farpointe does not challenge this evidence.  Accordingly, the accused products, except the CoG-1000, read on Claim 22.

Thus, the Court concludes as a matter of law that the accused products, except the CoG-1000, infringe Claims 20 through 22, and thus HID Global is entitled to summary judgment regarding infringement of these Claims with respect to these products.

In sum, the Court holds that HID Global's Motion for Summary Judgment regarding Infringement is granted with respect to all the accused products, except the CoG-1000.  Farpointe's Motion for Summary Judgment regarding Noninfringement is denied.

**B.     Invalidity Analysis**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

The Court now addresses the validity of the '862 and '935 Patents.

To obtain summary judgment of invalidity, a moving party must overcome the statutory presumption of 35 U.S.C. § 282 ("Section 282") that issued patent claims are valid. Section 282 mandates that "[a] patent shall be presumed valid" and that "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282. A party seeking to overcome the statutory presumption and establish the invalidity of an issued patent claim must prove the invalidity by clear and convincing evidence. <u>Apple Computer, Inc.</u> v. <u>Articulate, Sys., Inc.</u>, 234 F.3d 14, 26 (Fed. Cir. 2000).

Farpointe moves for summary judgment regarding the validity of the '862 Patent, alleging that claims in the '862 Patent are invalid pursuant to 35 U.S.C. §§ 102, 103, and 112. (Defs.' MSJ re Invalidity; Defs.' Opp. to Pls.' MSJ re Validity.) HID Global opposes Farpointe's Motion and moves for summary judgment finding both patents valid. (Pls.' Opp. to Defs.' MSJ re Invalidity; Pls.' MSJ re Validity.) The Court analyzes the invalidity arguments regarding each Patent separately.

### 1.    '935 Patent

HID Global moves for summary judgment finding that the '935 Patent is valid. Farpointe opposes this Motion, asserting that the '935 Patent is invalid under 35 U.S.C. §§ 102, 103, and 112. Farpointe does not move for summary judgment finding this Patent to be invalid. The Court addresses each validity argument in turn.

### a.    Validity of Patent under 35 U.S.C. § 102

A patent is anticipated and therefore invalid if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). A patent is also anticipated if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). A claim is "anticipated" for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

purposes of section 102 "if each and every limitation is found either expressly or inherently in a single prior art reference." IPXL Holdings, L.L.C. v. Amazon.com, Inc., 430 F.3d 1377, 1381 (Fed. Cir. 2005). Contrary to Farpointe's approach, it is not sufficient merely to show that a prior art device contains the "core" aspects of the claim. (Defs.' MSJ re Invalidity, pp. 6, 9.)

In this case, Farpointe asserts that four references or devices individually anticipate Claim 17 of the '935 Patent: (1) U.S. Patent No. 5,235,326 to Beigel *et al.* ("Beigel"); (2) U.S. Patent No. 5,347,263 to Carroll *et al.* ("Carroll"); (3) the HID MultiProx device ("MultiProx"); and (4) the Datamars ISO MAX III device ("ISO MAX III"). Farpointe asserts that the Beigel Patent anticipated dependent Claim 18 of the '935 Patent. (Defs.' Opp. to Pls.' MSJ re Validity, p. 19.) As a threshold matter, the Court must determine whether the MultiProx and ISO MAX III were in use or on sale in the United States more than one year prior to May 3, 1996, the '935 Patent application date. 35 U.S.C. § 102(b). Farpointe has presented sufficient evidence to show that the MultiProx was advertised and thus offered for sale at least as early as January 1996. (Cole Decl. in support of MSJ re Invalidity, Ex. H, p. 681-84.) Farpointe has not demonstrated, however, that the ISO MAX III qualifies as prior art. Farpointe's only evidence to suggest the ISO MAX III was used or offer for sale in the United States prior to the filing of the '935 Patent is a price list including this product, dated May 1995; however, the prices are listed in "Sfr.," Swiss Francs, and thus this document does not show that the device was offered for sale in the United States, as required by section 102. (Stewart Report, Ex. 10 in Cole Decl. re Invalidity, Ex. C, Docket No. 271.) Moreover, HID Global has presented evidence that the FCC did not authorize the ISO MAX III for sale in the United States until August 25, 1997, more than one year after the '935 Patent filing date. Accordingly, the ISO MAX III is not prior art and thus it cannot anticipate any of the claims of the '935 Patent.

Claim 17 discloses a "plurality of transponders . . . having different frequencies" and a "programmable interrogator." Thus, if the Beigel Patent and Carroll Patent do not disclose these elements, they cannot anticipate Claim 17.

         i.    <u>"Plurality of transponders . . . having different frequencies"</u>

                                    **CIVIL MINUTES - GENERAL**                              

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**        Date    April 13, 2012

Title      **HID Global Corp. et al. v. Farpointe Data, Inc.**

      Claim 17 requires that in response to "an" interrogation signal produced by the interrogator, the transponders transmit a signal that (a) uses a frequency or frequencies and a method or methods of modulation that are different from those used by another of a plurality of transponders and (b) has at least an identification component. (Claim 17; Claim Constr. p. 7.) Mr. Stewart opines the Beigel Patent discloses this element of Claim 17 because it describes a software programmable reader that can "communicate with many transponders despite differences among the transponders in their various operating frequency protocols." (Stewart Report, p. 18.) However, the operating frequencies of Beigel refer only to different <u>interrogation</u> signal frequencies used to interrogate transponders, not different frequencies <u>of the</u> <u>transponders</u> in response to a single interrogation signal frequency.[15] (Mihran Rebuttal Report ¶¶ 112-120.) Because Claim 17 requires different transponder frequencies in response to a single interrogation signal, Beigel does not anticipate Claim 17.[16] (<u>See id.</u> ¶¶ 46-47 (citing a portion of patent prosecution of '935 Patent in which applicant distinguished the invention from prior art based on the '935 Patent's use of a single interrogation signal)).

      Similarly, the Carroll Patent does not teach a "plurality of transponders . . . having different frequencies." The support cited by Mr. Stewart to show this element actually shows only that the hardware of the Carroll interrogator can be changed during manufacturing to read one type of transponder out of a few options. (Mihran Rebuttal Report ¶¶ 152-161.) Thus, the Carroll interrogator is not capable of reading transponder signals of a plurality of transponders. Accordingly, the Carroll Patent does not anticipate this element of Claim 17.

        ii.    <u>"programmable interrogator"</u>

     Neither the Beigel Patent nor the Carroll Patent disclose a "programmable

---

    [15] It is evident that the Claim discloses different transponder signal frequencies and not interrogator signal frequencies, as the Court has already held that "different frequencies" refers to the output of the different transponder, not the interrogator. (Claim Constr., p. 7.)

    [16] Because Claim 18 is dependent on Claim 17, the Beigel Patent likewise cannot anticipate Claim 18. Furthermore, nothing in the Beigel Patent specifically discloses an "EEPROM" memory device, and thus the Beigel Patent cannot disclose the coupling of an EEPROM to a microprocessor, as required by Claim 18. (Mihran Rebuttal Report ¶¶ 132-133.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

interrogator."  Regarding the Beigel Patent, the only supporting evidence Mr.
Stewart cites to show anticipation of this element is a passage in the Beigel Patent
referring to a transfer of transponder ID numbers to the use of a read-only memory.
This transfer does not show that the reader is "programmable."  (Mihran Rebuttal
Report ¶¶ 91-111 (citing Beigel Patent col. 10:20-22 and col. 18:23-28); Stewart
Report, pp. 28-29.)  Accordingly, Farpointe has not demonstrated that the Beigel
Patent anticipates this element of Claim 17.

The Carroll Patent does not disclose a "programmable reader" because the
reader does not allow reprogramming without disassembly and physical removal of
the microcontroller chip.  (Mihran Rebuttal Report ¶¶ 152-156.)  The Carroll
specification makes clear that changes to the "band pass amplifier circuit 46" can
be made to accommodate "a variety of manufacturer's products"; however, this
change must be made to the hardware during manufacturing, and thus no changes
are made "on site" by "reprogramming the interrogator software."  (Id. ¶¶ 152-156
citing Carroll Patent at col. 10:47-52.)  Accordingly, the Carroll Patent does not
anticipate this element of Claim 17.

In sum, because the Carroll Patent and the Beigel Patent do not disclose at
least two elements of Claim 17, they do not anticipate Claim 17 or its dependent
Claims 18 and 19.  Thus, the claims at issue in the '935 Patent are valid under
section 102.

### b.  Validity of Claims 17-19 Patent under 35 U.S.C. § 103

A patent is invalid under section 103 "if the difference between the subject
matter sought to be patented and the prior art are such that the subject matter as a
whole would have been obvious at the time the invention was made to a person
having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. §
103(a).

Farpointe argues that the '935 Patent is invalid under section 103 because
Farpointe disclosed prior art for each element of the claims at issue in its Invalidity
Contentions, and, considered compositely, combinations of prior art render each
individual claim obvious.  (Defs.' Opp. to Pls.' MSJ re Validity, pp. 13-14; see
Invalidity Contentions, Oines Decl. in support of Defs.' MSJ re Invalidity, Ex. B.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.     **SACV 10-1954 JVS (RNBx)**                Date    April 13, 2012

Title     **HID Global Corp. et al. v. Farpointe Data, Inc.**

However, compiling a list of prior art that satisfies the various elements of a claim is inadequate to show the composite of those elements–the claim–is "obvious." Indeed, "[a] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 418 (2007).  The Supreme Court noted that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does.  This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known." Id.  Here, Farpointe presents no evidence other than the Invalidity Contentions to show that the claims of the '935 Patent are obvious.  Thus, the claims at issue in the '935 Patent are valid under section 103.

### c.     **Validity of Claims 17-19 under 35 U.S.C. § 112**

Section 112 requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112.  "A claim is considered indefinite if it does not reasonably apprise those skilled in the art of its scope." IPXL Holdings, L.L.C., 430 F.3d at 1383-84.

Farpointe's only argument challenging the definiteness of the claims is that "methods of modulation" is used inconsistently within the patent and thus one of ordinary skill in the art would not understand the scope of the Patent.  (Opp. Br., p. 19; Stewart Report, pp. 29-30.)  As discussed in the Claim Construction (pg. 7-9), "method of modulation" is amenable to construction such that a person skilled in the art would understand the scope of the claim.  The Court does not find that "methods of modulation" is used inconsistently within the patent.  Thus, the claims at issue in the '935 Patent are sufficiently definite and therefore valid under section 112.

### 2.     **'862 Patent**

HID Global moves for summary judgment finding that the '862 Patent is valid.  Farpointe opposes this Motion, asserting that the '862 Patent is invalid under 35 U.S.C. §§ 102, 103, and 112.  Farpointe also moves for summary

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

judgment finding that the '862 Patent is invalid.  The Court addresses each invalidity argument in turn.

### a.  Validity of Patent under 35 U.S.C. § 102

Farpointe alleges that five prior art devices anticipate certain claims of the '862 Patent pursuant to 35 U.S.C. § 102: (1) the Dynasys Dual Band Evaluation Kit ("Dynasys Device"); (2) the MultiProx; (3) the XceedID XF1100; (4) the TI S4100; and (5) several Deister devices.  The Court declines to consider the Deister devices as prior art because these products were not disclosed in Farpointe's Invalidity Contentions.  Further, the Court has previously denied Farpointe's motion to add these products to the Invalidity Contentions, finding an absence of good cause for the late amendment and holding that the amendment would be unduly prejudicial to HID Global.  (Order re Mot to Amend Invalidity Contentions, Docket No. 118.)  Accordingly, the Court considers only the first four devices.

As a threshold matter, the Court must determine whether each of these devices was in use or on sale in the United States more than one year prior to the '862 Patent application date.  35 U.S.C. § 102(b).  The '862 Patent was filed on December 16, 2004, so any device sold or offered for sale before December 16, 2003 that meets all the elements of an '862 Patent claim anticipates that claim.  Thus, to show invalidity under section 102, Farpointe must first demonstrate that the purported prior art devices were used or offered for before December 16, 2003.  Farpointe has met this burden with respect to the Dynasys Device[17] and the MultiProx[18]; however, it has not met this requirement with respect to the TI S4100 and the XceedID XF1100.

Farpointe has failed to meet this burden with respect to the TI S4100, as it has not offered any evidence of the sale or use date for this product.  Farpointe

---

[17] The Dynasys Device was sold at least as early as October 5, 2001.  (Declaration of Tomas Grajales in Support of Def.'s Opp. to Pls.' MSJ re Validity ("Grajales Opp. Decl."), ¶ 6, Ex. A, Docket No. 230.)

[18] As mentioned above, HID MultiProx was advertised and thus offered for sale at least as early as January 1996.  (Cole Decl. in support of MSJ re Invalidity, Ex. H, p. 681-84.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

asserts that the TI S4100 device was developed and available at least as of May 11, 2004; however, the citation it provides for this assertion is merely a Datamars price list, dated May 1995, that does not mention the TI S4100. Moreover, the prices are listed in "Sfr.," or Swiss Francs, and thus even if the product were on this list, it would not show that the TI S4100 was used or sold in the United States at least one year prior to the '862 Patent filing date. (Defs.' Opp. to Pls.' MSJ re Validity, p. 8 (citing Stewart Report, Ex. 10 in Cole Decl. re Invalidity, Ex. C).) Further, Farpointe makes no mention of the use or offering date of this product in its statement of unconverted facts and conclusions of law regarding the invalidity of the '862 Patent. (Docket No. 163.) Accordingly, Farpointe has not met its burden of showing that the TI S4100 constitutes prior art, and thus the Court will not consider it in the invalidity analysis.

Farpointe has similarly failed to meet its burden regarding the XceedID XF1100 because it has not provided any evidence of when this product was first used or offered for sale. Farpointe asserted that the XceedID XF1100 was developed and available at least as of October 2004; however, the citation Farpointe provides for this assertion is an undated Datamars informational sheet that does not even mention the XceedID XF1100. (Defs.' Opp. to Pls.' MSJ re Validity, p. 9 (citing Stewart Report, Ex. 11 in Cole Decl. re Invalidity, Ex. C).) This evidence does not show that the XceedID XF1100 constitutes prior art. Further, Farpointe makes no mention of the use or offering date of this product in its statement of unconverted facts and conclusions of law regarding the invalidity of the '862 Patent. Accordingly, Farpointe has not met its burden with respect to this product, and thus the Court cannot consider it.

A prior art device anticipates a patent claim only if it satisfies each element of the claim. IPXL Holdings, 430 F.3d at 1381; see Voda v. Cordis Corp., 536 F.3d 1311, 1322-23 (Fed. Cir. 2008). In this case, there are at least two elements common to all the claims Farpointe is accused of infringing. First, each claim requires an "RFID reader," and second, each claim requires two antennas "tuned to operate" at different carrier frequencies. As discussed below, Farpointe has not met its burden of showing that either of the prior art devices satisfy both of these elements. Accordingly, the claims at issue are valid under section 102.

i.      '862 Patent Requires an RFID Reader

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   **SACV 10-1954 JVS (RNBx)**          Date   April 13, 2012

Title      **HID Global Corp. et al. v. Farpointe Data, Inc.**

      The parties dispute what constitutes an "RFID reader" in the context of the
'862 Patent.  The Patent specification describes the RFID reader as follows: "The
<u>RFID reader contains its own circuitry as well as its own reader programming</u>,
which are cooperatively designed to 'read' the data contained in the transponder
data signals received from the RFID transponder."  ('862 Patent, col. 1:60-63)
(emphasis supplied).  The use of the phrases "its own circuitry" and "its own
reader programming" suggests that the reader must be integrated and capable of
performing reader functions independently.  Moreover, an embodiment of the
"RFID Reader" shows that the "RFID Reader" includes a first antenna with a
tuning capacitor, a second antenna with a tuning capacitor, a signal generator, a
microcontroller, receiver electronics, power supply and an I/O interface.  ('862
Patent, col. 3:56-56, col. 4:20.)  From this embodiment and the specification, Dr.
Mihran concluded that one of ordinary skill in the art reading the term "RFID
reader" as used in this Patent would understand the term to mean an integral RFID
reader capable, by itself, of generating excitation signals and reading transponders.
(Mihran Report ¶¶ 353-54, citing '862 Patent, col. 4:20, Fig. 1.)  Although
Farpointe contends that the '862 Patent does not require that an RFID reader be
integral, it offers no support for that position and does not point to any evidence in
the Patent that suggests a different interpretation of an "RFID reader."
Accordingly, the Court concludes an "RFID reader" within the meaning of the
'862 Patent is an integral reader capable itself of generating exciter signals and
reading transponder signals.

      Farpointe has not demonstrated that the Dynasys Device anticipates any
claims of the '862 Patent because it has not shown that the Dynasys Device is an
"RFID reader" within the meaning of the '862 Patent.  Mr. Stewart's analysis of
the Dynasys Device does not establish that it is capable by itself of generating
excitation signal and reading transponders.  Indeed, the Dynasys advertising
materials Mr. Stewart relies on to show that the Dynasys Device meets the
elements of Claim 1 suggest that the Dynasys Device requires a PC and application
software running a Windows platform to generate excitation signals and read
transponders.  (Stewart Report, p. 33 (citing Decl., Ex. A at pp. 193-94); Mihran
Rebuttal Report ¶ 364.)  The advertising material states that the "included
application software [in the Dynasys Dual Band Evaluation Kit] is a Windows
compatible application that provides a means to fully demonstrate the functional
and performance capabilities of the Dual Band RFID interrogator using both HF

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

and LF transponders." (Oines Decl., Ex. A. p. 193.)  Thus, Farpointe's evidence suggests that the reader component of the Dynasys Device does not have the "functional and performance capabilities" of an RFID reader absent use of the application software.  Further, the marketing material discloses that the application software "allows the execution of the reader's supported commands such as <u>writing</u> and <u>reading</u> information <u>to</u> and <u>from</u> <u>Tag-it HF, Tag-it HF-I (ISO Compatible), and LF transponders</u>." (<u>Id.</u>) (emphasis supplied).  This statement also suggests that the software is necessary for sending and receiving signals from the transponders.

Additionally, deposition testimony of Mr. Tomas Grajales, the co-founder of Dynasys, further suggests that the Dynasys Device does not itself function as an integral RFID reader.  Mr. Grajales was asked, "Can you describe what is it that the [Dynasys Device] does so that when you present a tag in the vicinity of the reader the tag is energized?  Is there something that's being emanated from the device?" (Grajales Dep., Oines Decl., Ex. F at p. 59:7-16.)  Mr. Grajales replied, "This particular reader does–<u>is not automatically generating anything</u>, this particular reader.  There's [sic] other companies that have different readers that will continuously be interrogating, and –and it will–it will just spit out the information.  <u>This particular reader does not do that</u>." (<u>Id.</u>) (emphasis supplied).  Mr. Grajales's testimony further suggests that the Dynasys Device is not capable on its own of generating an excitation signal or reading transponders.  In light of this evidence suggesting that the Dynasys Device is not an RFID reader within the meaning of the '862 Patent, Farpointe has not met its burden of establishing that the Dynasys Device reads on every element of the claims at issue.  In other words, because each claim requires an RFID reader or an antenna array designed for an RFID reader, the Dynasys Device cannot anticipate any of the claims at issue in the '862 Patent.

The MultiProx product likewise cannot anticipate any of the claims of the '862 Patent because it is not an RFID reader within the meaning of the Patent.  It is undisputed that the MultiProx is a system comprised of a separate controller and reader device.  (Mihran Report ¶ 450; Stewart Dep., Ex. A, Cole Invalidity Reply Decl, at pp. 6:6-7:2.)  It is further undisputed that the reader component does not generate any interrogation signal in and of itself, nor does it process any received signals for creating an output signal substantially corresponding to an identification

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

signal. (Mihran Report ¶ 450; Cole Decl., Ex. C, pp. 254-55.) The reader component functions only when used in conjunction with a physically separate controller device in separate housing, connected with a coaxial cable. (Mihran Report ¶ 451.) Dr. Mihran states in his expert report that he examined a Multiprox reader unit and confirmed that when powered up, it neither generates a 125 kHz interrogation signal with respect to its proximity card functions, nor a 2 to 27 MHz sweep signal with respect to its Schlage SE card functions. (Id.) Dr. Mihran opines that such a two-part system with a separately housed "reader" connected via a coax line to a controller over distances of up to 500 feet, (see FAR016574), is not an "RFID reader" as that term is used in the '862 Patent. (Id. ¶ 453.) Farpointe does not dispute that the MultiProx is a two-part system, but rather, asserts that such an arrangement is contemplated by the '862 Patent. (Defs.' Reply in support of MSJ re Invalidity, p. 12, Docket No. 252.) Because the Court has declined to adopt Farpointe's understanding of "an RFID reader," Farpointe has not met its burden of showing that the MultiProx satisfies this element. Accordingly, the MultiProx does not anticipate any of the claims of the '862 Patent.

        ii.    <u>'862 Patent Requires Two Antennas "Tuned to Operate" at Different Carrier Frequencies</u>

For a device to anticipate any of the claims of the '862 Patent, it would necessarily need to be comprised of two antennas "tuned to operate" at different carrier frequencies. Farpointe has not demonstrated that the MultiProx has two antennas "tuned to operate" at different carrier frequencies. The only evidence Farpointe has presented to show that the tuning requirement is satisfied in the MultiProx is the MultiProx Installation Manual. (FAR0166601 at p. 2.) This Manual, however, actually shows that the second high frequency antenna in the MultiProx, called the "Schlage antenna," is not "tuned," but instead sweeps continuously between multiple frequencies. (Mihran Report ¶¶ 461-480 (citing the MultiProx Installation Manual).) Dr. Mihran tested the Schlage antenna coil and confirmed that it sweeps through frequencies between 2 and 30 MHz. (Id. ¶ 461.) Dr. Mihran opines that tuning the Schlage antenna to any frequency within this frequency range would render the antenna inoperable.[19] (Id.) Thus, the high

_____

[19] Farpointe attempts to refute Dr. Mihran's analysis with the declaration of Kirk Bierach, in which Mr. Bierach opines that when the Schlage antenna detects a signal from a transponder, it must be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |

| | |
|---|---|
| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |

frequency antenna in the MultiProx is not "tuned to operate" at a carrier frequency. Accordingly, this device does not anticipate any of the claims of the '862 Patent.

Regarding the Dynasys Device, Farpointe does not provide sufficient admissible evidence to show that two antennas in this product are "tuned to operate" at different carrier frequencies. Farpointe relies on the declaration of Tomas Grajales to show that the Dynasys Devices meets the claim language disclosing an RFID reader containing two antennas "tuned to operate" at different carrier frequencies. (Defs.' Opp. to Pls.' MSJ re Validity, p. 4 (citing Grajales Decl., Docket No. 230).) While the Court may rely on Mr. Grajales's knowledge of the Dynasys Devices, his declaration is inadmissible to the extent that it opines that the prior art satisfies the '862 Patent claim language. Farpointe did not designate Mr. Grajales as an expert witness in its Rule 26(a)(2) disclosures and Mr. Grajales has not claimed to be a person of ordinary skill in the art at the time of the invention or application. In any event, what constitutes being "tuned" is a matter of claim construction for the Court. It is Mr. Grajales's conclusions which the Court rejects, not his recitation of facts for which he has an adequate foundation.

Farpointe's expert Mr. Stewart also opines that the Dynasys Dual Band Reader includes two reader antennas "tuned to operate" at different carrier frequencies; however, Mr. Stewart's opinion is based on marketing material that merely states that, "[t]he Dynasys Dual Band Evaluation Kit contains everything required to allow you to evaluate both High Frequency (13.56 MHz) and Low Frequency (134 kHz) Radio Frequency Identification (RFID) technologies." (Stewart Report, p. 33 (citing Oines Decl., Ex. I at FAR001115).) While this advertisement suggests that the Dyansys device has high-and-low frequency signal reading capacity, it does not show that it has two antennas "tuned to operate" at different carrier frequencies, as required by the claims at issue. Mr. Stewart also includes a photograph taken from the physical unit he inspected, and opines: "I observed a first reader antenna tuned to operate at a first low carrier frequency as the claim requires. The first reader antenna is the red antenna coil shown in the

---

"tuned" to that particular frequency. (Bierach Decl., ¶ 5.) Thus, Mr. Bierach concludes, the "tuned to operate" element is satisfied. However, as discussed supra the infringement analysis, Mr. Bierach's opinions amount to claim construction which is exclusively in the Court's province. Accordingly, the Court rejects his opinion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

picture above." (Stewart Report, p. 33.) The red coil in the picture, however, is not connected to any leads and it does not include any tuning elements, such as capacitors in conjunction with windings having proper parameter values. (Mihran Report ¶¶ 371.) Such tuning capacitors are contemplated as part of the reader disclosed in the '862 Patent, as evidenced by Figure 1 and the description of tuning capacitors in the '862 Patent specification. ('862 Patent, fig. 1, col. 6:8-13.) Dr. Mihran opines that one of ordinary skill in the art would not understand a coil with unconnected leads and no tuning components to be "tuned to operate" to a particular carrier frequency. (Mihran Report ¶¶ 367-372.) The Court finds that Farpointe has not provided sufficient evidence to show that the Dynasys Device contained two antennas "tuned to operate" at different carrier frequencies, and thus the Dynasys Device does not anticipated Claim 17.

HID and Farpointe dispute several additional elements of the claims at issue; however, because every implicated claim requires disclosure of (1) an "RFID reader" or an "antenna array" for an RFID reader; and (2) two antennas "tuned to operate" at different carrier frequencies, a failure to meet these requirements necessarily means that the prior art cannot anticipate any of the claims at issue in the '862 Patent. Accordingly, the Court finds the '862 Patent is valid under section 102.

### b.    Validity of Patent under 35 U.S.C. § 103

Farpointe argues that the '862 Patent is invalid under section 103 because Farpointe disclosed prior art for each element of the claims at issue in its Invalidity Contentions, and, considered compositely, combinations of prior art render each individual claim obvious. (Defs.' Opp. to Pls.' MSJ re Validity, pp. 13-14; see Invalidity Contentions, Oines Decl. in support of Defs.' MSJ re Invalidity, Ex. B.) As discussed supra, this is insufficient to show that the a claim is obvious. Farpointe presents no evidence other than the Invalidity Contentions to show that the claims of the '862 Patent are obvious. Thus, the claims are valid under section 103.

### c.    Validity of Patent under 35 U.S.C. § 112

Farpointe asserts that the claims of the '862 Patent are indefinite because

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | **SACV 10-1954 JVS (RNBx)** | Date | April 13, 2012 |
|---|---|---|---|

| Title | **HID Global Corp. et al. v. Farpointe Data, Inc.** |
|---|---|

they disclose "both a system and the method for using that system," which renders a patent invalid under section 112. (Defs.' Opp. to Pls.' MSJ re Validity, p. 14 (citing IPXL Holdings, 430 F.3d at 1384).) Farpointe argues that Claim 1 of the '862 Patent requires both a system and method for using a system because it requires "an antenna array for an RFID reader" (the system or apparatus) and that the antenna "enabl[e] data communication with a first transponder transmitting data signals" (the process). (Id.) However, the latter quoted portion is not a "process"; rather, it is a defining characteristic of the antenna array. Moreover, the claim does not disclose "method steps of using" the antenna array–it discloses the capabilities of this particular antenna array. IPXL Holdings, 430 U.S. at 1384 (quoting PTO Manual of Patent Examination Procedure § 2173.05(p)(II) (1999)). Accordingly, Farpointe's reliance on the IPXL Holdings decision is misplaced. Farpointe has not demonstrated any indefiniteness or lack of enablement in the claims of the '862 Patent, and thus the Patent is valid under section 112.

In sum, the '935 and '862 Patents are valid as a matter of law. The Court grants HID Global's motion and denies Farpointe's motion.

IV.  Conclusion

For the foregoing reasons, the Court GRANTS HID Global's Motion regarding Infringement for all accused products, except (1) the P-600 and P-700 with respect to the '935 Patent and (2) the CoG-1000 with respect to the '862 Patent. The Court GRANTS HID Global's Motion regarding Validity as to the '935 and '862 Patents. The Court DENIES Farpointe's Motions.

IT IS SO ORDERED

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | ag |  |  |